## White Estate

*Russell J. Brownback,* for accountants.

*Samuel H. Sagendorph,* for claimant.

TAXIS, P. J., July 12, 1972.—Eleanor S. White died on September 18, 1970, leaving a will on which letters were granted to Continental Bank, Richard H. Gabel and J. Harrison Todd. By clause eleventh of her will, testatrix provided as follows:

"I give, devise and bequeath to CALVIN S. HATHAWAY, presently of 2601 Parkway, Philadelphia, Penna., subject to any encumbrances thereon, my home of 1700 DeKalb Street, Norristown, Penna. and the land appurtenant thereto together with all articles of furniture, furnishings, equipment and ornament not otherwise bequeathed."

The real estate was unoccupied at the time of decedent's death and remained unoccupied until it was sold on July 6, 1971. Calvin S. Hathaway, the devisee of the real estate, spent $683.71 for the following items:

1. Repairs of heater on January 27, 1971 ........................... $260.00
2. Philadelphia Electric service from

December 18, 1970 to April 21, 1971 .......................... 231.51

3. Philadelphia Electric service from June 2, 1971 to June 21, 1971 ...... 15.86

4. Philadelphia Electric—corrected bill —June 2, 1971 to June 21, 1971 .......................... 3.36

5. Lawn care—April-May 1971 ....... 163.50

6. Norristown Water Company—final bill ............................ 9.48

The estate paid the following items in 1970, for which the estate claims they should be reimbursed by Mr. Hathaway as owner of the real estate:

1. Change locks on house and garage ........................ $ 46.38

2. Open drain .................... 38.60

3. Lawn care ..................... 115.00

4. Repairs to garage ............. 11.61

5. Philadelphia Electric Company service ........................... 174.26

                                           $385.85

In addition, at the time of settlement on July 6, 1971, there was withheld from the proceeds, payable to Calvin S. Hathaway, the following sums:

1. Interest on mortgage from date of death to date of settlement on July 6, 1971 ................. $1,160.83

2. Sewer rent—January 1, 1971 to July 6, 1971 ................... 11.17

3. Taxes — County and Borough— January 1, 1971 to July 6, 1971 .......................... 607.59

                                       $1,779.59

Six days after death, the bank wrote the following letter to Mr. Hathaway:

"Following the location of this Will, we have immediately begun arrangements for appraisal of both the property and the personalty. This appraisal will be made by William D. Morley on October 1st and, as soon as their appraisal is received by us, we will immediately submit it to the Internal Revenue Service with our request they give us prompt approval to make distributions of the said personalty.

"In discussing this with our attorney we have been advised that it probably will be best not to make any transfer of the real estate until some later date in order to protect the estate from debts being presented and against the possibility of any later testamentary writing such as a Codicil or later Will. We have every reason to believe that this is the last such writing but under these circumstances, we feel the only distribution we can effect will be that of the personalty at the earliest possible date."

Five days later, namely on September 29, 1970, the bank wrote to the claimant as follows:

"I received your letter and wish to acknowledge that we were advised yesterday, September 28, of the unknown but apparent wide dispersal of keys to various persons. Immediately, upon learning of this, we contacted a locksmith who was meeting with one of our officers today at the property and arranging to change the various locks. Under these provisions, we will retain these in the possession of the Executors pending further distribution of the property to you."

Another letter, on April 14, 1971, in parts here pertinent, was sent to the claimant by the bank:

". . . the result of the review of this situation is that we would be willing to join in the sale providing an

agreement is effected between Mr. Hathaway and the Executors prior to such a sale that the Executors shall retain the proceeds of the sale until an Accounting, Adjudication and Distribution to Mr. Hathaway is confirmed by the Court, with said funds to be retained, subject to all expenses of maintenance being paid from the proceeds of the sale. As a modification of the above method, we would agree that the proceeds be held by a Title Company pending our presenting the question of liability for maintenance to the Court at the time of Audit and the resulting Adjudication."

It is clear that legal title to the real estate passed to Mr. Hathaway at decedent's death (section 301 of Probate, Estates and Fiduciaries Code of June 30, 1972 (no. 16-4)), and that Mr. Hathaway was thenceforth entitled to the net income from the real estate: Section 3543 of Probate, Estates and Fiduciaries Code. Coincident with entitlement to income from real estate is normally the expense and risk of ownership of the real estate: Brooks Estate, 2 Fiduc. Rep. 57 (1951). Under section 301 of the code, however, Mr. Hathaway's title was subject to the powers of the personal representative, including the power to take possession of, maintain and administer the real estate: Section 3311 of Probate, Estates and Fiduciaries Code.

It appears from the letters set out above that the personal representative exercised exclusive control over the real estate from decedent's death to April 14, 1971. The locks were changed, for example, and the keys were retained by the personal representative to the exclusion of Mr. Hathaway. Furthermore, the property was used by the personal representative for administration purposes of storing personal property until March 1971. This exercise of dominion and control was inconsistent with, and rendered ineffective,

Mr. Hathaway's legal title, and his entitlement to the net income. Since, during the period from decedent's death to April 14, 1971, the real estate served the personal representatives' purposes exclusively, the expenses incident to the retention of the real estate during that period are to be paid by the estate.

In the circumstances of this case, therefore, and for the foregoing reasons, the court concludes as follows:

1. The claim of the estate against Calvin S. Hathaway for reimbursement of expenses in the amount of $385.85 is refused, since all such expenses were incurred prior to April 14, 1971.

2. The claim of Calvin S. Hathaway for payment of the following obligations of the executors, all incurred prior to April 14, 1971, is allowed:

| | | |
|---|---|---|
| (a) | Philadelphia Electric Company — repair of heater | $260.00 |
| (b) | Philadelphia Electric Company — gas and electric service | 231.51 |
| (c) | Norristown Water Company—water bill | 9.48 |
| | TOTAL | $500.99 |

The balance of Calvin S. Hathaway's claim for payment of expenses is refused.

3. The expenses for which funds were withheld at settlement are apportioned as follows:

(a) Mortgage Interest—

To be paid by the Executors of the estate of Eleanor S. White for interest from September 18, 1970 to April 14, 1971 .................... $830.84

To be paid by Calvin S. Hathaway for interest from April 15, 1971 to July 6, 1971 ........................... 329.99

(b) Sewer Rent—

To be paid by the Executors of the estate of Eleanor S. White for sewer rent from January 1, 1971 to April 14, 1971 ........................... 6.21

To be paid by Calvin S. Hathaway for sewer rent from April 15, 1971, to July 6, 1971 ..................... 4.96

(c) Taxes—

To be paid by the Executors of the estate of Eleanor S. White for taxes from January 1, 1971 to April 14, 1971 .. 337.90

To be paid by Calvin S. Hathaway for taxes from April 15, 1971 to July 6, 1971 ........................... 269.69.

The account is confirmed, and it is hereby ordered and decreed that Continental Bank, Richard H. Gabel and J. Harrison Todd, executors, as aforesaid, forthwith pay the distributions herein awarded.

And now, July 12, 1972, this adjudication is confirmed nisi.